[Cite as *Morway v. Ohio Bur. of Workers' Comp.*, 2011-Ohio-7027.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LAURA L. MORWAY

Plaintiff

v.

OHIO BUREAU OF WORKERS' COMPENSATION, et al.

Defendants

Case No. 2003-10198

Judge Joseph T. Clark

DECISION

{¶1} Plaintiff brought this action alleging retaliation in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq., and for negligent hiring, supervision, or retention. In lieu of trial, this matter was submitted for decision on the issue of liability based upon the parties' briefs, the transcript of the March 24, 2004 evidentiary hearing, stipulations of fact, depositions, and supporting exhibits.[1]

{¶2} As a result of the evidentiary hearing, the court issued a decision finding that plaintiff's supervisors, Arlene Overton and George Durkin, were entitled to civil immunity, inasmuch as they acted within the scope of their employment and did not act with malicious purpose, in bad faith, or in a wanton or reckless manner toward plaintiff. On October 27, 2005, the Tenth District Court of Appeals affirmed the court's decision

---

[1]On March 9, 2007, summary judgment was granted in favor of defendants on Counts Two and Three of the amended complaint.

on immunity and summarized the evidence presented at the immunity hearing as follows:

{¶3} "[Plaintiff's] allegations are based upon a series of incidents, which occurred within the context of her employment at the Bureau of Workers' Compensation [BWC] in the Youngstown office. [Plaintiff] was employed as a Claims Assistant but began working as an Employer Services Specialist ("ESS") in January 2003, which involves talking to employers about the premium-discount program, drug-free workplace program, conducting consultations with employers and covering the front desk in the absence of another employee, the Account Examiner 2. (Tr. at 39.) Two times she traveled to Columbus for training in late January and one week in February. During the week in February, [plaintiff] worked 44 hours and 45 minutes. She completed a request for overtime pay, but her immediate supervisor, George Durkin, who is the Risk Supervisor, denied the request and asked her to flex the time. (Tr. at 44-48.) Durkin checked with his supervisor, Arlene Overton, who is the Service Office Manager, who also denied the request. [Plaintiff] then approached the union steward, Elizabeth Chahine, who contacted the assistant administrator in Columbus and [plaintiff] was subsequently, on March 6, 2003, informed that she would receive overtime pay. (Tr. at 51-52; 147-148.)

{¶4} "[Plaintiff] argues that, after this incident, Durkin and Overton began to harass her and engage in retaliatory actions. The next incident occurred on March 7, 2003, when [plaintiff] was covering the front desk because the Account Examiner 2 was absent. (Tr. at 54.) [Plaintiff] testified that, at 12:30 p.m., J.J. Kovacs relieved her. She went to the restroom and then to lunch, leaving the office at 12:36 p.m. She returned just before 1:36 p.m. (Tr. at 55-56.) Durkin was seated at the front desk and, in a loud voice, began to tell her she should not extend her lunch hour beyond the allotted one hour. He said, "'Lady, what does that clock say[?]'" (Tr. at 57.) He also complained that she had not properly logged-in phone calls, although she had not been trained to

do so.  (Tr. at 60.) Durkin also told her to distribute the mail, which she had already done.  (Tr. at 66.)  Mack Beck, a security guard, was in the lobby at the time and heard the exchange between [plaintiff] and Durkin.  (Tr. at 134.)  Beck testified that Durkin chastised [plaintiff] in an unpleasant tone of voice and [plaintiff] was crying.  (Tr. at 137; 140.)

{¶5} "On March 12, 2003, [plaintiff] filed a grievance concerning Durkin's behavior on March 7, and a grievance hearing was held on March 13, 2003.  Durkin denied yelling at [plaintiff].  Chahine testified at the trial that she informed Overton that Beck had witnessed the incident but Overton did not discuss the issue with Beck.  (Tr. at 153; 156; 140.) Overton concluded that Durkin had not acted inappropriately.  (Tr. at 71; exhibit No. 3.)

{¶6} "Also on March 7, [plaintiff] spoke to Durkin about a customer that she had been unable to assist in reinstating his coverage.  [Plaintiff] testified that she attempted to reach Durkin for assistance three times but he was away from his desk and she telephoned the Warren Service Office in an attempt to get assistance but was unsuccessful.  (Tr. at 77; 80.)  Durkin then instructed her as to the computer system. [Plaintiff] argues that Durkin accused her of failing to provide adequate service to the client, but Durkin and Overton failed to contact the customer to confirm their allegations.

{¶7} "On March 18, 2003, Durkin and Overton met with [plaintiff] for a Corrective Counseling session and to provide an action plan.  Durkin testified that he had been working on this action plan since February to address things that needed attention.  (Tr. at 218.)  [Plaintiff] testified that she was denied union representation, even though such counseling could result in disciplinary action.  [Plaintiff] contends that the action plan could not have been reasonably completed and had been implemented to cause her to fail in her position.  Durkin described the corrective counseling session and the action plan as an attempt to help [plaintiff] succeed.  (Tr. at 222.)

{¶8} "Another incident occurred on March 19, 2003, when [plaintiff] and Durkin were traveling together to an off-site location for a presentation. [Plaintiff] asked if she could visit another employer by herself the following day. [Plaintiff] described Durkin's response, as follows:

{¶9} "'* * * And he became immediately angry and defensive. His face turned red. His eyes were erratic. He was waving his arms, and he insisted that he was going with me, that I would not be going anywhere by myself. * * *' (Tr. at 88.)

{¶10} "[Plaintiff] testified that Durkin frightened her and she contacted Chahine and reported workplace violence. (Tr. at 92.) Shortly after this incident, [plaintiff] took a voluntary demotion to her former position as a Claims Specialist to avoid being under Durkin's direct supervision. She contends that she was constructively discharged as an ESS.

{¶11} "After [plaintiff] returned to her job as a Claims Specialist, [plaintiff] received a written reprimand for failure to use good behavior, and rude and discourteous treatment of management for allegedly referring to Durkin as an 'asshole.' (Tr. at 264; 258.) Overton testified that she received an email message from a supervisor in [plaintiff]'s area who overheard a conversation between [plaintiff] and a co-worker. Overton attempted to obtain witness statements but no one corroborated the claim. Overton conducted an investigatory interview and [plaintiff] denied making the comment, but Overton issued a written reprimand. (Tr. at 261; 264.)

{¶12} "[Plaintiff] argues that these incidents are indicative of retaliatory behavior by Durkin and Overton because she proved them wrong regarding the overtime issue. Durkin and Overton both denied such." *Morway v. Ohio Bur. of Workers' Comp.*, Franklin App. No. 04AP-1323, 2005-Ohio-5701, ¶2-10.

**FLSA RETALIATION**

{¶13} With regard to the retaliation claim, 29 U.S.C. 215(a)(3) of the FLSA provides that it shall be unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

{¶14} Ohio courts apply the burden shifting analysis of *McDonnell Douglas v. Green* (1973), 411 U.S. 792, to FLSA retaliation claims. *Adair v. Charter Cty. of Wayne* (C.A.6, 2006), 452 F.3d 482; *Nicklas v. UPS, Inc.* (N.D. Ohio Dec. 7, 2007), Case No. 1:07 CV 73, 2007 U.S. Dist. LEXIS 90463. In order to establish a prima facie case of retaliation under the FLSA plaintiff must prove the following elements: 1) she engaged in a protected activity under the FLSA; 2) her exercise of this right was known by the employer; 3) thereafter, the employer took an employment action adverse to her; and 4) there was a causal connection between the protected activity and the adverse employment action. Id.

{¶15} Once plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its adverse employment action. Id. If defendant provides a legitimate, non-retaliatory reason for its action, then plaintiff must prove by a preponderance of the evidence that defendant's proffered reason is not the true reason for the adverse employment action, but is a mere pretext for illegal retaliation. Id. Plaintiff may demonstrate pretext by showing: 1) the proffered reason had no basis in fact; 2) the proffered reason did not actually motivate the defendant's adverse action; or 3) the defendant's proffered reason was insufficient to motivate the adverse action. *Kocsis v. Multi-Care Mgt., Inc.* (C.A.6, 1996), 97 F.3d 876, 883.

{¶16} Plaintiff asserts that her request for overtime wages and the subsequent action taken by her union steward to obtain such overtime wages was protected activity

under section 215(a)(3) of the FLSA. However, 29 U.S.C. 215(a)(3) protects only "employees who have filed a complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." *Nicklas*, supra. The plaintiff in *Nicklas* raised various employment issues, including his contention that he was not being paid properly for overtime, and he utilized the grievance process under a collective bargaining agreement to address those issues. The district court in *Nicklas* noted that the plaintiff had not instituted any action pursuant to the FLSA and the court determined that filing a grievance for alleged violations of the collective bargaining agreement did not constitute protected activity under the FLSA. Id.

{¶17} The evidence shows that plaintiff resolved the issues concerning her overtime pay through her union representatives and plaintiff has not established that she either did file or could have filed a complaint or instituted proceedings under the FLSA. Inasmuch as plaintiff has failed to establish that she engaged in protected activity, the court finds that she has not established a prima facie retaliation claim.

{¶18} Even if plaintiff had engaged in protected activity, she would still have to prove that BWC took an employment action adverse to her. As stated above, plaintiff voluntarily returned to her former position as a claims specialist. Plaintiff contends that the adverse employment action was being forced to accept a constructive demotion as a result of being "harassed" by her supervisors through disciplinary actions including "public chastising," yelling, and issuing her both a counseling statement and an "action plan."[2]

{¶19} The same factors apply to claims involving allegations of both constructive demotion and constructive discharge. *Kauffman v. Kent State Univ.* (C.A.6, Apr. 1,

---

[2]Although plaintiff has alleged constructive discharge as a distinct claim, it will be addressed as a theory related to the retaliation claim. See *State ex rel. Jelinek v. Schneider*, Franklin App. No. 08AP-957, 2010-Ohio-1220, ¶13-15.

1994), Case No. 93-3302, 1994 U.S. App. LEXIS 6557. "'The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.'" *Simpson v. Ohio Reformatory for Women*, Franklin App. No. 02AP-588, 2003-Ohio-988, ¶24, quoting *Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578, 1996-Ohio-265. The court must "'determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent.'" Id., quoting *Mauzy*, supra.

{¶20} With regard to the action plan, in her deposition, plaintiff testified that she had already drafted her request to return to her former position on March 13, 2003, and that the action plan was not presented to her until five days later, during a March 18, 2003 meeting with Durkin and Overton. Therefore, the court finds that the action plan was not related to plaintiff's desire to return to her former position. Furthermore, "institution of performance improvement plans does not constitute an objectively unreasonable condition sufficient to show constructive discharge." *Rossi v. Alcoa, Inc.* (C.A.6, 2005), 129 Fed. Appx. 154, 159, citing *Agnew v. BASF Corp.* (C.A.6, 2002), 286 F.3d 307, 310.

{¶21} Regarding the conduct of Durkin and Overton, the court notes that plaintiff's supervisors denied making certain comments that plaintiff claimed upset or embarrassed her. Even assuming that plaintiff's supervisors talked to her in a loud voice or yelled on occasion, yelling alone does not constitute an adverse employment action. *Campbell v. Mobile Solution Corp.* (S.D. Ohio Mar. 2, 2010), Case No. 1:07cv1037, 2010 U.S. Dist. LEXIS 29446. "An employee has an obligation not to jump to conclusions and assume that every conflict with an employer evidences a hidden intent by the employer to terminate the employment relationship." *Simpson,* supra, ¶25.

{¶22} Although the conduct described by plaintiff may at times have been both unprofessional and excessive, based upon the totality of evidence, the court finds that

such conduct is insufficient to show that a reasonable person under the circumstances would have felt compelled to request a demotion. Accordingly, plaintiff cannot prevail on her retaliation claim.

**NEGLIGENT HIRING, SUPERVISION, OR RETENTION**

{¶23} The elements of a negligent retention claim are the same as those for negligent supervision. *Browning v. Ohio State Hwy. Patrol*, 151 Ohio App.3d 798, 2003-Ohio-1108, ¶67, citing *Harmon v. GZK, Inc.*, Montgomery App. No. 18672, 2002-Ohio-545. The elements needed to establish a claim for negligent hiring, retention and supervision are: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 729, citing *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 739; see also *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978. Liability for negligent retention arises where an "employer chooses to employ an individual who 'had a past history of criminal, tortious, or otherwise dangerous conduct about which the [employer] knew or could have discovered through reasonable investigation.'" *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, ¶14, quoting *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 61. It is axiomatic that a claim of negligent hiring, supervision, and retention against an employer is not viable without an underlying act of negligence by an employee that causes injury or loss. *Lehrner v. Safeco Ins./Am. State Ins. Co.*, 171 Ohio App.3d 570, 2007-Ohio-795, ¶42.

{¶24} It is undisputed that Durkin and Overton were employees of BWC; however, plaintiff failed to establish any of the other above-referenced elements. Specifically, plaintiff has failed to show that either Durkin or Overton were incompetent.

Plaintiff alleges only that "Durkin was incompetent to manage female subordinates." (Trial brief, page 24.) Plaintiff alleges that Durkin spoke loudly and became angry with Janis Depasqua and that Depasqua complained about Durkin's conduct in 1999. John Sled, a former service officer manager for BWC, confirmed that Depasqua complained that she became uncomfortable when Durkin looked over her shoulder and "lurked behind her" while she sat at her desk. (2007 Sled deposition, pages 11-12.) However, Sled also testified that, at a subsequent meeting, Depasqua "basically recanted the majority of her concerns about George. She – as I remember, she said she had some additional time to think about it and that perhaps she had been overreactive in expressing some of her concerns about George." (2010 Sled deposition, page 20, lines 2-6.)

{¶25} Plaintiff has not presented any convincing evidence that Durkin had either a propensity toward aggression or an inability to supervise female subordinates which would render him an incompetent employee. Similarly, there was no evidence upon which this court could conclude that Overton was incompetent. Inasmuch as plaintiff has failed to prove by a preponderance of the evidence that either Durkin or Overton were incompetent in performing their duties as supervisors, plaintiff cannot prevail on her claim of negligent hiring, retention, and supervision.

{¶26} For the foregoing reasons, the court finds that plaintiff has failed to prove any of her claims by a preponderance of the evidence. Accordingly, judgment shall be rendered in favor of defendants.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LAURA L. MORWAY

    Plaintiff

    v.

OHIO BUREAU OF WORKERS' COMPENSATION, et al.

    Defendants

Case No. 2003-10198

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

{¶27} This case was submitted for decision on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendants. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

                               _____
                               JOSEPH T. CLARK
                               Judge

cc:

Amy S. Brown
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

John T. Heino
Richard J. Thomas
6 Federal Plaza Central, Suite 1300
Youngstown, Ohio 44503

AMR/dms

Filed December 19, 2011

To S.C. reporter March 20, 2012